404 P.2d 27

**In re ESTATE of Margaret Schramm HOLTEN, Deceased.**

**Paul SCHRAMM, Objector and Appellant,**

v.

**TRACY–COLLINS BANK & TRUST CO. et al., Defendants and Respondents.**

**No. 10281.**

Supreme Court of Utah.

July 19, 1965.

Gustin, Richards & Mattsson, Harley W. Gustin, Salt Lake City, for appellant.

Cannon, Duffin & Pace, Ray, Quinney & Nebeker, Salt Lake City, for respondents.

McDONOUGH, Justice.

Paul Schramm, surviving brother and sole heir of Margaret Schramm Holten, appeals from a judgment of the District Court rejecting his contention that his sister's will was invalid because she lacked testamentary capacity and was acting under undue influence when it was made.

It appears that the testatrix Margaret S. Holten was a somewhat eccentric personality. She lived as a widow for many years. She had an only child, her son Buddy, who was limited in his capabilities and who died in 1956 at the age of 26. She was greatly attached to him during his lifetime and brooded over him after his death. She owned considerable real estate, including apartments which she managed and rented, from which she obtained her living. She died in 1962 at the age of 72 leaving an estate worth in excess of $160,-000, substantially all of which was left to the Genealogical Society of the L.D.S. (Mormon) Church, herein referred to as the L.D.S. Church; and leaving only a nominal bequest of $100 to her brother, the objector herein.

Sometime early in the year 1959 Mrs. Holten visited Bishop Carl W. Buehner, then a member of the Presiding Bishopric of the L.D.S. Church. Her purpose was to discuss her problems including some troubles with a neighbor. Thereafter she made other visits to Bishop Buehner and later advised him that she had to undergo an operation and that she desired to leave her property to the Church when she died. He made the suggestion to her that she could leave it to a church auxiliary, the Genealogical Society. She requested him to arrange to have one of the church's legal counsel, Vernon Snyder, draft a will for her which was done and the will was duly executed. It named Bishop Buehner as the executor and left $100 to her brother Paul the objector herein, with the remainder of her estate to go to the Genealogical Society.

After the testatrix's death, an olographic will dated October 13, 1959 (eight months

after the will referred to above) was found in her safe. It is obviously patterned closely after the earlier lawyer drawn will and makes generally the same dispositions of her property, giving the bulk of her estate to the Genealogical Society. However, it is noteworthy that there are quite a number of particulars in which the will was changed, the most significant one of which is the change of the executor from Bishop Buehner to the Tracy-Collins Trust Company.

In approaching the problems here presented, it should be kept in mind that it is presumed that the testatrix was competent and was acting of her own free will and not under duress or undue influence. The initial burden of proof on those issues was upon the objector.[1] Mrs. Holten is described as of the time of making the will as being 69 years of age, physically weak, pessimistic, distrustful, somewhat forgetful and because of her paranoid tendencies often felt that her rights were being invaded by others. The fact that she had these personality faults in some degree is not particularly surprising in a person of 69 years. And their presence is no proof that she lacked testamentary capacity. What is required is that she was able to remember who were the natural objects of her bounty, recall to mind what property she had to dispose of; and that she had the capacity to intelligently and voluntarily form a plan in her mind to make disposition of it.[2]

The fact that the testatrix managed her own property and cared for herself and her home up to the time of her death and left an estate of $160,000 is itself a pretty good indication that she had at least the capacity required to make a will. We place no particular significance on the recital "I have no living heirs" emphasized by the objector as showing she was confused. She was undoubtedly simply in error and meant that she had no children or members of her own immediate family. Insofar as the objector being the "natural object of her bounty" is concerned, she was aware of his existence and of her relationship to him. The evidence is to the effect that he had lived in California for many years; they had seen each other only infrequently; and there is no indication that she felt any close tie of affection or regard for her brother. Whatever it may have been, it is plain that she had him in mind and in both wills made such provision as she desired for him.

As we view the evidence the most that can be said of the attempt to show her incompetency is that she manifested some eccentricities of personality. The psychia-

1.  In re Swan's Estate, 4 Utah 2d 277, 293 P.2d 682.

2.  In re Swan's Estate, supra Note 1; In re Richard's Estate, 5 Utah 2d 106, 297 P.2d 542.

trist who testified for the objector said she was a "chronic paranoid personality, which at times bordered on a paranoid reaction." However the psychiatrist was unwilling to say that she was not competent, but actually stated that the indications were to the contrary.

The issue as to undue influence seems to be adequately answered by an analysis of what happened with respect to the two wills. For the purpose of such analysis, it can be assumed that the evidence may admit of an inference that there was some undue influence or persuasion upon the testatrix by persons representing the interests of the Church, bearing upon the making of the first will, although there is actually no direct evidence of such fact. But the second will was made eight months later, unquestionably in the privacy of her home. It is a comparatively long document neatly and carefully written in her own hand. It contains numerous provisions reciting her desires with respect to the disposition of her property. The record is totally devoid of any evidence that this was done other than of her own free will and choice. Furthermore, it is in harmony with the fact that after the death of her son she had stated to several friends that she was going to leave her property to the L.D.S. Church. It is also significant that this second will was in existence for three years after it was made. It was in her possession and she had ample opportunity to revoke or repudiate it if she had so desired.[3]

We agree with the view of the trial court that the evidence proffered by the objector was insufficient to make a prima facie case of incompetence or of undue influence. Accordingly he properly refused to submit the case to the jury. Affirmed. Costs to be paid by objector (appellant).

HENRIOD, C. J., and CROCKETT, WADE and CALLISTER, JJ., concur.

---

3. See statement in re Lavelle's Estate, 122 Utah 253, 248 P.2d 372.