In the Matter of the ESTATE OF Alice KESLER, Deceased.

FIRST INTERSTATE BANK OF UTAH, Special Administrator of the Estate of Alice Kesler and Trustee of the Alice Kesler Trust; and Intermountain Health Care, Inc., American Cancer Society, Utah Division, Church of Jesus Christ of Latter-Day Saints, and University of Utah Medical Center, beneficiaries of the Alice Kesler Trust, Plaintiffs and Appellants,

v.

David O. KESLER, Calvin Kesler, Joseph Kesler, and Mary Kesler Davies, Defendants and Respondents.

In the Matter of the ESTATE OF Alice KESLER, Deceased.

FIRST INTERSTATE BANK OF UTAH, Trustee of the Alice Kesler Trust; and Intermountain Health Care, Inc., American Cancer Society, Utah Division, Church of Jesus Christ of Latter-Day Saints, and University of Utah Medical Center, beneficiaries of the Alice Kesler Trust, Plaintiffs and Appellants,

v.

David O. KESLER, Calvin Kesler, Joseph Kesler, and Mary Kesler Davies, Defendants and Respondents.

No. 18434, 18540.

Supreme Court of Utah.

May 16, 1985.

Rehearing Denied June 11, 1985.

J. Wendall Bayles, Salt Lake City, for 1st Interstate Bank of Utah.

Richard M. Hymas, Richard H. Johnson, II, Patricia Leigh, Phillip V. Christensen, David L. Wilkinson, William R. Evans, John McAllister, Salt Lake City, for other plaintiffs.

Alan Syllivan, Salt Lake City, for Intermountain Health Care, Inc.

Eldon Eliason, Delta, for David Kesler.

R. Clayton Huntsman, Fillmore, for other Keslers.

HALL, Chief Justice:

Alice Kesler died on January 25, 1980, at the age of eighty-eight years, leaving a will and trust by which she devised only one percent of her estate to each of her five adult children, and the remainder to her grandchildren, great-grandchildren, and several charitable and religious organizations. The trustee of the trust petitioned the court for probate of the will, and four of the children contested the validity of the will and trust. After a seven day trial, judgment was entered in contestants' favor based on a jury verdict that Mrs. Kesler was mentally incompetent and unduly influenced when she made the will and trust. The trustee and beneficiaries of the will and trust appeal, contending there was insufficient evidence to support the jury verdict.

A testator is presumed competent to make a will [1] and the burden of proof of testamentary incapacity is on the contestants of a will.[2] Thus, to prevail in this case, the Kesler children were required to show by a preponderance of the evidence that Mrs. Kesler was incompetent to make the contested will and trust.

The classic test of general testamentary capacity has three elements: to make a will, one must be able to (1) identify the natural objects of one's bounty and recognize one's relationship to them, (2) recall the nature and extent of one's property, and (3) dispose of one's property understandingly, according to a plan formed in one's mind.[3] If any of these three elements is lacking at the time the will is made, the will is invalid.[4] Further, an insane delusion that affects one's understanding of the natural objects of one's bounty, the nature and extent of one's property, or the nature of the testamentary act, and that materially affects one's disposition of one's property, may invalidate a will.[5]

On appeal from a judgment based on a jury verdict, we may reverse only if, viewing the evidence in the light most favorable to the verdict, there is no substantial evidence to support it.[6] Viewed in this light, there was substantial evidence adduced at trial in this case to support the jury verdict that Mrs. Kesler suffered from insane delusions that materially affected the contested will and trust, and thus was

---

1. *In re Estate of Holten,* 17 Utah 2d 29, 31, 404 P.2d 27, 29 (1965).

2. U.C.A., 1953, § 75–3–407 (1978 ed.). *See also id.; In re Estate of Richards,* 5 Utah 2d 106, 110, 297 P.2d 542, 544, *cert. denied,* 352 U.S. 943, 77 S.Ct. 265, 1 L.Ed.2d 238 (1956), *reh'g denied,* 352 U.S. 982, 77 S.Ct. 381, 1 L.Ed.2d 366 (1957); *In re Estate of Swan,* 4 Utah 2d 277, 283, 293 P.2d 682, 686 (1956).

3. See *Holten, supra* note 1, at 31, 404 P.2d at 29; *Richards, supra* note 2, at 116, 297 P.2d at 548; *Swan, supra* note 2, at 281, 293 P.2d at 684. *See also In re Chongas' Estate,* 115 Utah 95, 98–99, 202 P.2d 711, 712–13 (1949); 1 Bowe-Parker, Page on Wills § 12.21 at 606 (1960).

4. 1 Bowe-Parker, Page on Wills § 12.21 at 608 (1960).

5. *See, e.g., In re Estate of Hodtum,* Fla.App., 267 So.2d 686 (1972), *cert. denied,* Fla., 272 So.2d 158 (1973); *In re Estate of Martin,* 270 Cal. App.2d 506, 75 Cal.Rptr. 911 (1969); *Lindley v. Lindley,* Tex., 384 S.W.2d 676 (1964); *In re Estate of Meagher,* 60 Wash.2d 691, 375 P.2d 148 (1962); *In re Will of Wicker,* 15 Wis.2d 86, 112 N.W.2d 137 (1961); 1 Bowe-Parker, Page on Wills, § 12.48 at 659 (1960).

6. *Richards, supra* note 2, at 116, 297 P.2d at 548.

mentally incompetent at the time she made the will and trust. Viewed in the light most favorable to the jury verdict, the evidence adduced at trial established the following facts which support the jury verdict.

Alice Kesler was the widow of Otto Kesler, who died in 1966. They had five children: Mary Kesler Davies, David Kesler, Joseph Kesler, Marion Kesler, and Calvin Kesler. For over twenty years before Otto's death, the family operated a ranch and farm in Cove Fort, Utah. This ultimately constituted the bulk of Mrs. Kesler's estate, in addition to other farm land in Beaver and Millard counties, and substantial cash savings.

In 1956, David Kesler moved to Montana, but continued to have frequent contact with the family through regular correspondence and occasional visits. After their father's death, Joseph and Calvin Kesler and their immediate families continued to live on and operate the Cove Fort ranch and farm. Mrs. Kesler's relationship with her children was harmonious, as it had been in the past.

Mrs. Kesler was particularly close to her eldest son David. In 1971, she executed a revocable trust agreement, appointing David trustee of all her real property, including Cove Fort, for the benefit of herself for life and, after her death, for the benefit of her children equally, with a sixth share to be divided among her stepson and some of her grandchildren.

From the time he married her daughter in 1939 until about 1971, Mrs. Kesler also maintained a close relationship with her son-in-law, LeGrande Davies. Davies would often perform errands for Mrs. Kesler, such as shopping, mowing her lawn, repairing appliances and taking her to visit people on Memorial Day. Beginning in 1952, Davies also assisted Mrs. Kesler in handling her money. He would pick up her mail and make deposits and withdrawals at her request at the local bank, where he was a manager. Mrs. Kesler kept funds in a joint savings account and safety deposit box with Davies.

Around the early 1970's, however, a series of events began which culminated in the estrangement of Mrs. Kesler from all five of her children, and the making of the contested will and trust. First, Mrs. Kesler abruptly accused Davies of misappropriating her savings at the bank. At Mrs. Kesler's request, David Kesler investigated her charges. Davies denied any wrongdoing and fully cooperated in the ensuing investigation. A bank audit was performed, which cleared Davies of any wrongdoing. Still unsatisfied, Mrs. Kesler hired an independent certified public accountant, Ellsworth Brunson, to conduct an audit. The independent audit also cleared Davies of the charges. When Brunson reported his findings to Mrs. Kesler, however, she persisted in her belief that Davies had stolen from her and accused Brunson of having been "bought."

Then, in about 1972, Mrs. Kesler accused Joseph and Calvin Kesler of misappropriating wool, feed, sheep, cattle and other proceeds from the Cove Fort operation, and demanded that they vacate the property. She and David Kesler, as trustee, brought suit to eject them and to obtain an accounting. Mrs. Kesler again hired Brunson to audit the Cove Fort records. Because of inadequate records, the audit was inconclusive. Numerous attempts were made by Brunson, David, Joseph, Calvin and others to dissuade Mrs. Kesler from her belief that her sons had "stolen her blind." Ultimately, the lawsuit was settled, Mrs. Kesler being granted possession of the property, Joseph and Calvin leaving Cove Fort, each taking one third of the sheep and cattle, and the parties agreeing that Mrs. Kesler was not entitled to additional income or damages. No evidence supporting Mrs. Kesler's accusations was ever produced. Thereafter, however, Mrs. Kesler adamantly maintained her belief that her sons had stolen from her.

Shortly after having established the trust, Mrs. Kesler had written David, stating she wished to take her property in Fillmore, Utah, which consisted of her home and other residential property, out of

the trust and give it to David upon her death. She then executed a withdrawal statement, removing her Fillmore property from the trust. In 1972, Mrs. Kesler made a will in which she devised most of her estate to David and only $100 each to Joseph and Calvin Kesler. The will specifically mentioned the failure of Joseph and Calvin to give her a satisfactory accounting. In 1973, Mrs. Kesler went with David to the Salt Lake City office of Fred L. Finlinson, an attorney, and requested that a deed be prepared to convey her Fillmore property to herself and David in joint tenancy. The deed was prepared and executed and was witnessed and notarized by Finlinson. Mrs. Kesler gave the deed to David with instructions to record it, which he did several days later.

In 1975, however, Mrs. Kesler accused David of having stolen her Fillmore property by bringing the deed to her home and folding it under to reveal only a signature line. She claimed she signed the deed at his request, thinking it was a will, and not knowing it conveyed a present interest in the property to David. Mrs. Kesler sued David to set aside the deed and to revoke her trust. At trial in that case, Mr. Finlinson testified as to the circumstances in which the deed was signed. The trial court upheld the deed, finding that Mrs. Kesler had voluntarily and knowingly signed the deed.[7] Nevertheless, Mrs. Kesler continued to believe that David had somehow tricked her into signing the deed.

In 1975, Mrs. Kesler wrote a letter to Mary Kesler Davies in which she accused her children of robbing her of her property, taking advantage of her, and saying that she had lost her mind and other "ugly untruths" about her. She directed her grandson, Greg Kesler, to read the letter aloud at her funeral. After her death, he complied.

In 1977, Mary Kesler Davies, and Joseph and Calvin Kesler petitioned the court to appoint a guardian of the estate of Mrs. Kesler. The trial court appointed a guardian, but this Court reversed that decision on the ground that the trial court had improperly applied a repealed guardianship statute.[8]

On January 22, 1979, Mrs. Kesler executed the will and trust contested here. Approximately one year later, she died. The physician attending her at her death determined the probable cause of death to be acute myocardial infarction, a condition associated with arteriosclerosis.

At trial, Dr. Jack L. Tedrow, a psychiatrist and attorney, testified on behalf of the contestants. Dr. Tedrow's opinions were based on his examination of various documents, including letters written by Mrs. Kesler and the testimony of Mrs. Kesler and others at the 1978 guardianship proceedings. Dr. Tedrow testified that, in his opinion, on the date the will and trust were executed, Mrs. Kesler suffered from a progressive mental illness dating from 1972 or before. He diagnosed her as having suffered from paranoid psychosis and advanced arteriosclerosis, both progressive in nature. According to Dr. Tedrow, Mrs. Kesler's mental condition would have influenced her disposition of her property by causing her to either disinherit her children or to leave them only a very minimal amount.

Dr. Tedrow further testified that Mrs. Kesler's beliefs that her son-in-law had taken money from her savings account, that her sons had stolen her cattle, and that David had tricked her into signing the deed were insane delusions. According to Dr. Tedrow, Mrs. Kesler's denial of executing the deed to David in Finlinson's office "shows confusion, lack of memory, and a paranoid ideation, a paranoid condition." Further, Dr. Tedrow testified that Mrs. Kesler had "berated her children in a very

---

7. In an unreported decision, this Court affirmed the district court's decision. *Kesler v. Kesler*, No. 15520, slip op. (Utah January 24, 1979).

8. *In re Guardianship of Kesler*, Utah, 612 P.2d 357 (1980). Although, in dictum the court questioned the sufficiency of the evidence to support appointment of a guardian, the court did not rule on that issue.

paranoid fashion" in the letter she directed to be read at her funeral.

Finally, Dr. Tedrow testified:

Now, [paranoid persons] have, in a sense, two lists, the good guys and the bad guys. They have an enemy list. . . . And once David began to do things to try to help his mother with this Trust, he became part of the enemy list; because when she worked with people and her family over a period of time, they eventually became the enemy, just like when she put the money in the Fillmore bank in a safety deposit box, she soon began to accuse her daughter, Mary, and her son-in-law, LeGrande, of taking the money. And so you can see this thing progress over the years, as people tried to get close to her and help her, that more and more she built up the enemy list, till finally she had everybody in her family excluded, I mean of her five children. She [didn't] trust any of them.

. . . . .

As these people deteriorate and get more paranoid, they develop tremendous egos; they think they're right all the time; they can't be crossed. You might say to look at them wrong sometimes puts you on the enemy list. . . . [T]hey become megalomaniacs. They have such a strong ego that the end point of this is that no one can tell them much of anything, unless they're one of the good guys. And if they're on that good list, then they can be very, very influential. But this would not have been a member of her family. Nobody in the family of the five children ended up on the good list.

Several persons testified at trial about Mrs. Kesler's understanding of the natural objects of her bounty when she made the will and trust. Dr. Tedrow testified that Mrs. Kesler's understanding of the natural objects of her bounty was "abnormal" because of her paranoia. Dan Bushnell, an attorney who had represented Mary, Joseph and Calvin in the lawsuits against Mrs. Kesler, testified that Mrs. Kesler was "under character and personality influ-

ences which interfered with her rational and reasonable relationships with her children." Mr. Brunson, who in addition to having conducted the audits for Mrs. Kesler was a long-time family friend, testified that in 1978 Mrs. Kesler harbored a great deal of bitterness and hatred toward her children and had disowned them, having once stated that she regretted the day they were born. David Kesler testified that, although Mrs. Kesler knew her children by name, she knew Joseph and Calvin only as thieves who had tried to rob her, himself as one who had tried to take her property, LeGrande as one who had tried to take her money, and Mary as one who had put LeGrande up to it. David Kesler stated that, at the time the will and trust were made, his mother no longer knew her children as she had known them when they were being raised. LeGrande Davies testified that Mrs. Kesler did not realize her children were the ones she should love and who loved her. Calvin Kesler testified that Mrs. Kesler knew her children's names, but did not know them as the natural objects of her love.

Several witnesses also testified about Mrs. Kesler's ability to recall the nature and extent of her property when she made the will and trust. Dr. Tedrow testified that Mrs. Kesler had "only a very vague and general concept of her property." Mr. Bushnell testified that Mrs. Kesler clearly had not understood the nature and terms of a 1977 transaction in which she had granted a lease and option to buy the Cove Fort property, and that her express desires were not carried out in the documentation for that transaction. Mr. Bushnell also testified that Mrs. Kesler had not understood a simple medical release form she had signed only an hour before he had taken her deposition in 1978. Mr. Brunson testified that, in June 1978, Mrs. Kesler did not remember that his audit had exonerated Mr. Davies from the charge of misappropriating her property, and that her mental capacity was "much diminished" at that time. David Kesler testified that Mrs. Kesler did not know her property and described sever-

al specific occasions on which Mrs. Kesler had misidentified or failed to recognize her property. According to David, "she understood it if you explained it to her, but as far as her identifying it to you, she couldn't do it." Joseph Kesler testified that based on his mother's testimony at the guardianship proceeding, he believed she did not know the nature and extent of her property. Calvin Kesler also testified that his mother did not know the value, nature, boundaries, or extent of her property.

Finally, numerous witnesses testified about Mrs. Kesler's ability to form a plan for the disposition of her property when she made her will and trust. Dr. Tedrow testified that Mrs. Kesler's ability to form a plan for the disposition of her property was "distorted" by her mental illness. Mr. Bushnell testified that "she had created such strong feelings of suspicion, distrust, persecution, delusions ... that she could not be reasonable or rational in what she had in mind to do with her property, and what she ultimately did do with her property." David Kesler testified that his mother was unable to form a fixed plan for the disposition of her property, and that her plans changed from day to day depending on who she was with. Joseph Kesler also testified that his mother was incapable of formulating a set plan for the disposition of her property.

■ Proponents challenge the competency of the testimony of various witnesses that Mrs. Kesler was mentally incompetent when she made the contested will and trust. As to Dr. Tedrow, proponents contend his testimony lacked probative value because he had no personal contact with Mrs. Kesler, he did not interview any of her relatives, friends or neighbors or her personal physician, he examined only her correspondence to David Kesler and no correspondence written during the last five years of her life, and he did not consider the deposition testimony of LeGrande Davies that Mrs. Kesler was competent when she made a $10,000 gift to Mary Kesler Davies in 1978.

These alleged deficiencies go to the weight, rather than the admissibility, of Dr. Tedrow's testimony. We have previously held that a psychiatrist may testify on the mental competency of a testator without having personally examined the testator.[9] Proponents had ample opportunity to, and did, cross-examine Dr. Tedrow about any facts he may not have taken into consideration in formulating his opinion. It was the jury's perogative to weigh Dr. Tedrow's testimony in light of the basis for his opinions. These alleged deficiencies in the foundation for Dr. Tedrow's testimony did not render his testimony so speculative or baseless as to not constitute competent evidence on which the jury could have relied in reaching its verdict.

Proponents further challenge Dr. Tedrow's testimony that Mrs. Kesler had insane delusions. Proponents contend the evidence established that Mrs. Kesler was not mistaken in her belief that her children were trying to deprive her of her property and that, in any event, there was a reasonable basis for her belief.

■ Various definitions of an insane delusion have been advanced by numerous authorities.[10] In the case of *In re Hansen's Will*,[11] we adopted this definition: " 'An insane delusion is a belief which has no basis in reason and which cannot be dispelled by argument.' " An insane delusion that may invalidate a will is to be distinguished from a false belief based on some fact or evidence. If there is any rational basis for the belief, even though the belief is in fact mistaken, it is not an insane delusion.[12]

Competent evidence, however, showed that Mrs. Kesler did not merely believe her children were trying to take her property

9. *Richards, supra* note 2, at 112, 297 P.2d 546.

10. 1 Bowe-Parker, Page on Wills, § 12.30 (1960).

11. 52 Utah 554, 568, 177 P. 982, 987 (1918) (citing 40 Cyc. 1013 and 1 Underhill, Wills § 91).

12. *Id.*

from her. Rather, it showed that Mrs. Kesler believed her children had in fact stolen from her in several specific instances. Moreover, the evidence showed that this belief had no basis in reason. The evidence showed that her beliefs that Le-Grande had stolen money from her bank accounts, that Joseph and Calvin Kesler had stolen proceeds from Cove Fort, and that David had tricked her into signing a deed appeared to spring from nowhere, were completely unsupported by evidence, and held despite evidence to the contrary and despite many attempts by friends and relatives to dissuade her. While there may have been evidence on which Mrs. Kesler could have based a belief that her children coveted or felt entitled to a share of her property, there was no evidence that Mrs. Kesler's beliefs that her children had in fact stolen from her were in any respect founded in reason, either sound or illogical.

Proponents argue that David Kesler's conduct in investigating the charges against LeGrande and joining his mother in the lawsuit against Joseph and Calvin supports the inference that David shared his mother's suspicions, and that there must have been some rational basis for those suspicions. The jury, however, was not compelled to draw these inferences and could have reasonably concluded, for example, that David was merely fulfilling his obligations as trustee of his mother's estate and acting only upon his mother's accusations rather than upon extrinsic evidence. Moreover, there was no evidence that David, like his mother, continued to believe that LeGrande, Joseph or Calvin had wronged his mother after evidence to the contrary had surfaced.

Next, proponents claim the testimony of several witnesses on the issue of Mrs. Kesler's mental competency was incompetent because it was based on events too remote from the date the contested will and trust were executed.

In *In re Hansen's Will*,[13] we stated:

[T]he facts upon which the opinion [as to the testator's sanity] is based should be relevant to the issue and should not be too remote in point of time. It should always be remembered that in such cases the test is whether the testator had testamentary capacity at the time the alleged will was made, and the inquiry should be limited to a period of time not too remote from that event.

In *Hansen*, we held that the trial court erred in admitting the testimony of two lay witnesses regarding the testator's sanity, where one witness never had any conversation with the testator and based his opinion on what he saw and heard his mother say about the testator some five years before the trial, and where the other witness based his opinion on a single incident involving the testator that occurred ten to twelve years before his death and did not support the inference drawn by the witness.

We further explained in *In re Hanson's Estate*:[14]

The matter of remoteness depends somewhat on what characteristics the giver of the opinion testifies to. Such as would be unlikely to change or which tended to show some inherent brain weakness or some psychological disturbance of a permanent nature may be given, although observed years before the making of the will. On the other hand, characteristics or observations which come from age or from some physical condition of a nature, removable or variant or temporary, must have been observed in fair proximity to the date of execution of the instrument.

In *Hanson*, we held the trial court did not err in admitting the testimony of witnesses who had only limited contact with the testator at the time the contested will was made and where the testimony was commensurate with the witnesses' observations.

In both *Hansen* and *Hanson*, we observed that great latitude is permitted in introducing evidence on the question of mental capacity. In *Hanson* we stated:

**13.** 50 Utah 207, 221–22, 167 P. 256, 261 (1917).

**14.** 87 Utah 580, 600, 52 P.2d 1103, 1113 (1935).

The matter of proper foundation or qualification of a witness to state a conclusion, an opinion or an impression, where the same is permissible in evidence, lies largely in the sound discretion of the trial court.... The trial court has the duty first to determine whether there are any underlying facts testified to from which the jury could draw an inference as to mental condition. If there is not sufficient of such facts, the court must refuse to permit the witness to state a conclusion, whatever the conclusion, which might be permissible had there been sufficient underlying facts. But when there are some underlying facts from which the jury could draw an inference of other than normal mental condition, then whether there is sufficient foundation for the expression of an opinion by the lay witness or whether such opinion would be helpful to the jury rests almost altogether in the judicial discretion of the trial judge.[15]

■ In the present case, David, Joseph and Calvin Kesler had little contact with their mother during the last two to three years of her life. Each of them, however, saw and heard her testify during the 1978 guardianship proceedings. And, each of them had had frequent and close contact with their mother before the last few years of her life. These contacts provided sufficient foundation for them each to give an opinion on the mental competency of their mother in January 1979, when she made the contested will and trust, especially in light of the testimony of Dr. Tedrow that Mrs. Kesler suffered from a progressive mental illness. None of the evidence tended to show that Mrs. Kesler's mental condition improved or that she experienced lucid intervals during the last few years of her life. Proponents' objections to the testimony of David, Joseph and Calvin Kesler thus go to the weight, rather than the admissibility, of the testimony. Again, the weight to be accorded the testimony was a matter for the jury to decide in light of the basis therefor.

In addition to the above evidence, there was substantial evidence that would have supported a verdict that Mrs. Kesler was competent when she made the contested will and trust. Most notably, on the date she executed the will and trust, Mrs. Kesler was examined briefly by two psychiatrists, both of whom found her mentally competent. The jury, however, was not compelled to accept the testimony of these psychiatrists. Both based their opinions on short personal interviews with Mrs. Kesler, who, they noted, was extremely eager to prove she was competent when they examined her. Except for a copy of the contested will and trust, these interviews were unsupplemented by any information extrinsic to that given them by Mrs. Kesler herself. When questioned on cross-examination about the history of Mrs. Kesler's unfounded accusations against her children, both psychiatrists conceded there were indications of paranoia and insane delusions. Moreover, while both psychiatrists diagnosed Mrs. Kesler as mentally competent, they also diagnosed her as having had mental problems, paranoid tendencies and a personality disorder. Thus, the difference in opinion between Dr. Tedrow and the two psychiatrists who examined Mrs. Kesler on the date she made the contested will and trust was one of degree, and the jury need not have wholly rejected the testimony of proponents' expert witnesses to conclude that Mrs. Kesler was mentally incompetent to make the will and trust.

Mrs. Kesler's personal physician during the last three years of her life, Dr. David G. Limburg, also testified for proponents. Dr. Limburg was not a psychiatrist but stated that Mrs. Kesler's orientation was normal. Dr. Limburg also conceded, however, that Mrs. Kesler's dispute with David over the warranty deed and the letter he directed to be read at her funeral may indicate that Mrs. Kesler had delusions. Dr. Limburg further testified that, in his opinion, Mrs. Kesler did not die from a myocardial infarction, but from a pulmonary embolus, a condition unrelated to arte-

---

15. *Id.* at 606, 52 P.2d at 1115–16 (citations omitted).

riosclerosis. According to Dr. Limburg, Mrs. Kesler did not have advanced arteriosclerosis, although her medical history included some indication of arteriosclerosis.

█ Whether Mrs. Kesler had arteriosclerosis was a question of fact on which conflicting evidence was presented to the jury. There was substantial evidence from which the jury could have concluded that Mrs. Kesler suffered from arteriosclerosis, despite the testimony of Dr. Limburg to the contrary.

█ The question on appeal from a judgment based on a jury verdict is not whether there is substantial evidence which would have supported a contrary verdict, or even whether this Court, had it been trier of fact, would have reached the same verdict as that reached by the jury. Rather, the issue is whether the jury's findings are supported by substantial competent evidence. Despite evidence to the contrary there was substantial evidence to support the jury's finding that Mrs. Kesler was incompetent to make a will when she made the contested will and trust. In light of our findings on this issue, we need not reach the issue of the sufficiency of the evidence to show undue influence.

█ Finally, proponents argue the trial court erred in refusing to give certain proposed instructions to the jury. Among other instructions, the court refused to give the following:

> You are instructed that any evidence suggesting that Alice Kesler was old or at times may have been physically weak, pessimistic, distrustful, somewhat forgetful and because of alleged paranoid tendencies often felt that her rights were being invaded by others, even if true, is no proof that Alice Kesler lacked the mental capacity necessary to make a will.

This instruction is a paraphrase from our opinion in the case of In re Holten's Estate,[16] in which we stated:

Mrs. Holten [the testator] is described ... as being 69 years of age, physically weak, pessimistic, distrustful, somewhat forgetful and because of her paranoid tendencies often felt that her rights were being invaded by others. The fact that she had these personality faults in some degree is not surprising in a person of 69 years. And their presence is no proof that she lacked testamentary capacity.

In Holten, we further noted that the psychiatrist who testified as to the testator's paranoia "was unwilling to say that she was not competent, but actually stated that the indications were to the contrary."[17] Thus, we held the evidence insufficient to make a prima facie case of testamentary incapacity.

Holten is not to be interpreted as holding that evidence of physical infirmity, pessimism, distrustfulness, forgetfulness and paranoia may not be considered by the jury in determining testamentary capacity. In Holten, we held that the limited evidence adduced in that case amounted only to evidence of personality faults and, taken alone, was insufficient to prove testamentary incapacity. A similar context arose in Hansen. There, we stated:

> We do not want to be understood as holding that the personal habits, the general behavior, eccentricities, age, physical infirmities ... were not proper subjects for investigation in testing the mental capacity of the testator. These, and many other matters, are proper subjects of inquiry in this class of cases. So, too, were the attitude of the testator towards his children and the fact that he failed to substantially recognize them by way of bequests under the will are matters to be considered in the determination of the sanity of the testator.[18]

The effect of the above proposed instruction was to remove certain factors from consideration by the jury. Those factors, however, were proper matters for the jury's consideration along with the other

---

16. *Supra* note 1, at 31, 404 P.2d at 29.

17. *Supra* note 1, at 32, 404 P.2d at 29.

18. *Supra* note 11, at 569, 117 P. at 987.

evidence adduced at trial. Thus, the trial court's refusal to give the instruction, as proposed, was not error.

■ On the issue of insane delusions, proponents requested the following instruction: "You are instructed that a mistaken idea obstinately held is not a delusion or proof of an unsound mind." Again, this proposed instruction is a paraphrase of language from an opinion of this Court which, taken out of context and standing alone, is a misleading and incorrect statement of law.[19] While a "mistaken idea obstinately held" is not necessarily an insane delusion, such an idea may indeed constitute an insane delusion that may invalidate a will if the idea is totally unfounded in reason.[20] Thus, the proposed instruction is an incomplete, and as such, misleading statement of the law and was properly refused.

Proponents also requested that the following instruction be given:

You are instructed that Judge Christian Ronnow's appointment of a guardian for the estate of Alice Kesler in 1978 was deemed improper by the Utah Supreme Court and declared to be a nullity and without force and effect. You are also instructed that the appointment of a guardian in 1978 does not prove nor does it constitute evidence that Alice Kesler was mentally incompetent or not of sound or disposing mind at the time of the appointment of the guardian in 1978 or at the time of the signing of the will and trust on January 22, 1979, and the quitclaim deeds on April 29, 1979.

■ This Court has previously recognized that "the test as to capacity to execute a will, or a trust deed, or enter into other transactions, is quite different from the [statutory] requirements ... relating to

the appointment of a guardian."[21] Thus, in *Cornia v. Cornia*[22] we reversed a declaratory judgment that a will and trust deed were void while upholding the appointment of a guardian of the estate of the ward. And, in *In re Chongas' Estate*,[23] we held that evidence of the testator's commitment to a mental hospital ten days after he made his will and the later appointment of a guardian of his person and estate were "without weight upon the question of capacity since there was not at either time an adjudication of insanity."[24] Thus, the appointment of a guardian does not necessarily mean one is incapable of making a will.

■ In the present case, not only was the appointment of a guardian for Mrs. Kesler's estate nullified by this Court's reversal of the appointment, but the appointment in the first instance appeared to be based on Mrs. Kesler's physical infirmities rather than on any mental incompetence. Thus, the appointment of a guardian itself had no probative value on the issue of Mrs. Kesler's testamentary capacity and a jury instruction to that effect would have been appropriate.

■ Even assuming, however, that proponents' requested instruction was an accurate statement of the law, the trial court's refusal to give the instruction was not reversible error. We may reverse a trial court judgment only if there is a reasonable likelihood that, absent the error, there would have been a result more favorable to the complaining party.[25] The failure to give an instruction to which a party is entitled may constitute reversible error only if it tends to mislead the jury to the prejudice of the complaining party or insuf-

**19.** The proposed instruction was taken in part from *In re Hanson's Estate, supra* note 14, at 609, 52 P.2d at 1117.

**20.** See *supra* notes 5 & 10–12 and accompanying text.

**21.** *Cornia v. Cornia,* Utah, 546 P.2d 890, 893 (1976) (footnote omitted).

**22.** *Id.*

**23.** *Supra* note 3.

**24.** *Supra* note 3, at 101, 202 P.2d at 714.

**25.** *Lee v. Mitchell Funeral Home Ambulance Serv.,* Utah, 606 P.2d 259, 261 (1980); *Rowley v. Graven Bros.,* 26 Utah 2d 448, 451, 491 P.2d 1209, 1211 (1971).

ficiently or erroneously advises the jury on the law.[26]

Here, the jury was adequately instructed on the three major elements required to find testamentary incapacity. Proponents concede that the record of the guardianship proceeding, as opposed to evidence of the appointment itself, was competent evidence on which the jury could have properly relied in determining Mrs. Kesler's mental competence at the time she made the contested will and trust. By far, most of the evidence of the guardianship proceeding focused on the record of that proceeding, not on the appointment itself. Evidence of the appointment was presented only incidentally, to supplement or explain other evidence, rather than to prove incapacity. Further, there was substantial evidence to support the finding of mental incompetence, without considering the appointment of the guardian. Under these circumstances, we deem any error in the refusal of the instruction harmless.

Proponents rely on In re Estate of Merrill[27] to support their contention that the refusal to give the instruction on the appointment of a guardian was prejudicial. In Merrill, the court stated that the refusal of the trial judge to instruct as to the limited effect of a guardianship was error which was prejudicial to the proponents. It is to be observed, however, that the court's discussion of the jury instruction issue was dicta, since the court held that the evidence was insufficient to prove the testator was of unsound mind when she made her will. The court addressed the jury instruction issue as a possible explanation for the unsupported jury verdict, stating: "It may be that the jury was unduly influenced by the repeated reference to the guardianship matter and the denomination of deceased as 'an incompetent.' "[28]

In this case, unlike Merrill, there was substantial, competent evidence, aside from the appointment of the guardian, to support the jury verdict. Evidence of the appointment was adduced only incidentally and was not emphasized to the jury. Under these circumstances, it is unlikely the jury was misled by the absence of an instruction on the limited effect of the appointment and we find no reversible error.

■■■ Finally, proponents contend the court erred in refusing to give the following instruction:

Every person of sound mind, over the age of 18 years, and not acting under undue influence or fraud, has the right to make a will directing the disposition of his or her property upon his death in any way he or she sees fit. He or she is under no obligation to make such disposition as will meet with the approval of a judge or jury.

The right to dispose of property by will is a fundamental right assured by law and does not depend on this right being wisely used.

A will cannot be set aside simply because it may appear to you or to me to be unreasonable or unjust.

Again, assuming this instruction could have properly been given, the failure to give the instruction was harmless error. The trial court specifically instructed the jury on the right to make a will, the presumption of competency to make a will and the findings necessary to determine testamentary incapacity. Since the jury was otherwise adequately instructed, the proponents were not unfairly prejudiced by the trial court's failure to give the particular instruction they requested.

Affirmed.

STEWART, HOWE, DURHAM, J., and RICHARD C. DAVIDSON, District Judge, concur.

ZIMMERMAN, J., does not participate herein; DAVIDSON, District Judge, sat.

26. State v. Ouzounian, 26 Utah 2d 442, 444, 491 P.2d 1093, 1095 (1971); Richards, supra note 2, at 111, 297 P.2d at 545 (1956).

27. 80 Wyo. 276, 341 P.2d 506 (1959).

28. Id. at 289, 341 P.2d at 510.