In the Matter of the ESTATE
OF Joel W. KOTTKE,

Iris Enders and Ralph Kottke,
Appellants,

v.

Connie Parker, Personal Representative
of the Estate of Joel W. Kottke,
Appellee.

No. S–8932.

Supreme Court of Alaska.

July 28, 2000.

Timothy R. Byrnes, Hughes Thorsness Powell Huddleston & Bauman LLC, Anchorage, for Appellants.

C. James Mathis, Davis & Davis, P.C., Anchorage, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

## I. INTRODUCTION

Joel Kottke's deceased wife's adult children and his sibling challenge his will, which left the vast majority of his present estate to the woman who cared for him and with whom he lived as he died of cancer. They challenge the will under theories of undue influence and insane delusions. The superior court denied both theories after a seven-day trial. Because the superior court did not err in its findings of fact or in its conclusions of law, we affirm the judgment admitting the will to formal probate.

## II. FACTS AND PROCEEDINGS

Joel Kottke married late and outlived his first wife, Martha. She already had adult children by a deceased first husband when they married in 1958. Joel treated her children much as he would have if they were his own.

Throughout their lives together, Joel and Martha managed to accumulate a modest estate. In 1983 they had wills drawn up contemporaneously, each leaving the entire estate to the surviving spouse. The residual estate was to pass one-half to Martha's children and one-half to Joel's siblings upon the death of the surviving spouse.

Martha died in 1991. Martha's children, particularly Iris Enders, divided some of the personal effects of their mother immediately after her death. This division of Martha's possessions during the grieving period upset Joel. Additionally, Joel later concluded that the original copy of the 1983 will had disappeared from a fire-proof box or safe he kept hidden in his basement. Joel was apparently wrong in his belief that the will was stolen because it was later found in the house; it was probable that Iris did not take it. Despite these events and the suspicions connected with them, Joel's relations with Martha's children remained fair for some time.

In 1992 or 1993, following Martha's death, Joel started spending more time with Connie Parker, a long-time acquaintance. By all accounts, Martha's children and Connie did not get along; familial relations between Joel and Martha's children became strained as Joel and Connie spent more time together.

Joel and Connie had been living together for three years by the time he was diagnosed with prostate cancer in September 1996. The day after the diagnosis, Joel started pursuing a reworking of his will with a visit to Connie's friend, attorney Max Gruenberg. Gruenberg referred Joel to his own estate planner, attorney Trigg Davis. Over the

course of nine months, Joel carefully reworked his will through the law offices of Davis & Davis.

Connie was present at some of the will-planning sessions, but her exact role was unclear. She also performed administrative functions of the will-making process, such as writing checks for the legal fees and dropping off requested documents at the Davis & Davis office. She did not actively participate in substantive aspects of the will planning or execution. Iris and the other beneficiaries under Joel's 1983 will were not aware that he was changing his will in a manner that effectively cut them out. Joel executed a new will on June 10, 1997, in a ceremony at which Connie was absent.

Joel was receiving medical treatment throughout this period. Connie was the primary care giver and was present for all of his medical procedures. She also provided his necessary home health care.

Relations with Iris and Martha's other relatives continued to sour. In August 1997 Iris learned that Joel had changed his will. In September Iris reported to the State Division of Senior Services that Joel was receiving substandard care from Connie and that Connie was taking his money and had coerced him to change his will. The state investigation revealed no evidence to support the allegations. Joel died on October 1, 1997.

Connie was nominated as the personal representative under the 1997 will and filed to have it formally admitted to probate. The 1997 will left Iris an interest in Joel's property in Kenai and left the remaining estate to Connie under a trust system that was effectively a life estate.

Iris and the other beneficiaries under the 1983 will filed a petition to set aside the 1997 will on October 29, 1997. The primary theories they advanced were that Connie had an undue influence on Joel in his waning days and that Joel was suffering from insane delusions when he redrafted his will. On September 24, 1998, the superior court made extensive findings of fact and conclusions of law. The court held that the facts were inadequate to justify invalidating Joel's 1997 will under either the doctrine of undue influence or the doctrine of insane delusions. This appeal followed.

## III. DISCUSSION

### A. Standard of Review

■ This appeal involves issues of both law and fact. In reviewing questions of law, we "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[1] We will not set aside the trial court's findings of fact unless they are clearly erroneous.[2] A finding of fact is clearly erroneous if we are left with "a definite and firm conviction on the entire record that a mistake has been made, although there may be evidence to support the finding."[3] In making this determination, we view the evidence in the light most favorable to the prevailing party below.[4]

### B. Connie Parker Did Not Exert Influence on Joel Kottke Sufficient to Justify Invalidating the Will.

■ The superior court made extensive findings of fact after a seven-day trial regarding whether Connie unduly influenced Joel in the making of his 1997 will. We have reviewed those findings and detect no error. In fact, the trial court made an exemplary inquiry and specifically addressed each factual contention raised by Iris.[5] The trial court's findings and conclusions on this issue are more than sufficient and we will not disturb them here.

---

1. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

2. Alaska R. Civ. P. 52(a); *see also Paskvan v. Mesich,* 455 P.2d 229, 232 (Alaska 1969) (stating that under Civil Rule 52(a), "we may not set aside ... findings unless we determine them to be clearly erroneous" (footnote omitted)).

3. *Mathis v. Meyeres,* 574 P.2d 447, 449 (Alaska 1978) (citations and internal quotation marks omitted).

4. *See id.*

5. Judge Tan's findings of fact relevant to this issue are appended to this opinion.

### C. *Joel Kottke Was Not Suffering from Insane Delusions When He Drafted and Executed His Will.*

We have not previously addressed the question of insane delusions in the context of a contested will. Therefore, we apply our independent judgment in adopting the most prudent rule of law by considering precedent, reason, and policy.[6]

#### 1. *The test for insane delusions incorporates the test for testamentary capacity.*

■ A claim of insane delusions challenges the testamentary capacity of the testator.[7] Therefore, a test for insane delusions should incorporate the existing framework that applies to testamentary capacity.

We addressed the issue of testamentary capacity in *Paskvan v. Mesich.*[8] The test asks whether the testator understood the nature and extent of his or her property, the natural or proper objects of his or her bounty, and the nature of his or her testamentary act.[9] Any challenge under the umbrella of testamentary capacity necessarily attacks one or more of these elements; finding a deficiency on any one of the three elements invalidates the will.[10]

■ A challenge of insane delusions does not differ from other challenges to testamentary capacity. Thus, a simple extension of the testamentary capacity framework to account for claims of insane delusions provides the best approach.[11] First, there must be an insane delusion: "An insane delusion is a belief which has absolutely no foundation in fact, and even slight evidence which provides a basis for the belief negates the existence of a delusion."[12] Beliefs based on fact but derived from faulty logic or distorted by emotion will not support a claim of insane delusions.[13] Thus, the belief must be totally devoid of reason and must lack even a glimmer of a factual basis. Second, the will must be the product of an insane delusion. This requires that the will must be "the product or offspring of [a] delusion" or it must be materially affected by a delusion.[14] Accordingly, the party contesting the will must show that but for the delusion, the will would be materially different. Thus, the test is whether the testator suffered from an insane delusion that gave rise to the will, or materially affected the will, by rendering the testator incapable of understanding the extent of his or her property, the natural or proper objects of his or her bounty, or the nature of his or her testamentary act.[15]

#### 2. *Joel Kottke was not suffering from insane delusions that undermined his testamentary capacity.*

■ Iris challenges the will based on the theory that Joel suffered from paranoid delusions that Iris rifled through his safe and stole his original will, and that she took Martha's jewelry and other belongings. Iris maintains that these delusional beliefs drove Joel to cut her and Joel's siblings out of the will. Iris's theory fails.

---

6.  *See Guin,* 591 P.2d at 1284 n. 6.

7.  *See generally In re Estate of Kesler,* 702 P.2d 86, 88 (Utah 1985) (suggesting that insane delusions can result in testamentary incapacity); 79 Am. Jur.2d *Wills* § 87, at 339–40 (1975) ("A will which is the product of an insane delusion . . . is invalid for want of testamentary capacity . . . .") (footnote omitted).

8.  455 P.2d 229, 234 (Alaska 1969).

9.  *See id.* (citation omitted).

10.  *See Estate of Kesler,* 702 P.2d at 88.

11.  This was precisely the approach used by the Utah Supreme Court in *Estate of Kesler,* 702 P.2d at 88. *See also In re Estate of Meagher,* 60 Wash.2d 691, 375 P.2d 148, 149 (1962); 79 Am.Jur.2d *Wills* § 88, at 341–42 (1975).

12.  *Dillon v. Phillips,* 92 Or.App. 65, 756 P.2d 1278, 1279 (1988) (citation omitted).

13.  *See id.* at 1279; *Estate of Meagher,* 375 P.2d at 149.

14.  79 Am.Jur.2d *Wills* § 88, at 341; *see also Estate of Kesler,* 702 P.2d at 88–89 ("[T]here was substantial evidence adduced at trial . . . to support the jury verdict that Mrs. Kesler suffered from insane delusions that materially affected the contested will and trust, and thus was mentally incompetent at the time she made the will and trust.").

15.  *See Estate of Kesler,* 702 P.2d at 88.

As the superior court found, there is evidence in the record that the will was missing from the safe. There was also evidence that Iris had participated in dividing some of Martha's property immediately after Martha's death. Regardless of who took the will or how it disappeared, and regardless of the circumstances surrounding the division of property, these events gave Joel a factual basis for his beliefs that Iris rifled through his safe and improperly took Martha's property following her death. The superior court also found that the evidence regarding whether Martha's jewelry was missing was inconclusive, but that Joel at least had a factual basis for his belief that it was taken. Thus, Joel had factual bases for his beliefs. This is sufficient to refute both theories of insane delusions. Since Joel had at least some slight factual basis for his beliefs, they were not delusions (even if they were incorrect). Because appellants failed to show that Joel suffered from insane delusions, and because appellants raised no other challenge to Joel's testamentary capacity, the superior court correctly rejected their challenge to the 1997 will.

## V. *CONCLUSION*

The superior court properly found that the facts urged by Iris did not support theories of undue influence or insane delusions. Because the superior court did not err in its findings of fact or in its conclusions of law, we AFFIRM the judgment.

### APPENDIX [16]

1) In determining the issue of undue influence, the court has considered numerous factors.

2) The court finds that Connie Parker and Joel Kottke were in a confidential relationship.

3) Connie Parker is not the sole beneficiary of Joel Kottke's June 10, 1997 will. Under the will, Connie Parker was to receive Joel Kottke's interest in the Anchorage condominium she co-owned with him, and Iris

Enders was to receive Joel Kottke's interest in a piece of Kenai Peninsula property. Under the Trust provisions of the will, Connie Parker also received what essentially amounts to a life estate in Joel Kottke's Wasilla, Alaska property, with the remainder given to two charities.

4) As Trustee and Beneficiary of the Trust set up in Joel Kottke's will, Connie Parker has broad powers, but the powers are not unlimited. There are also obligations. The Court is not willing to conclude that Connie Parker would break her fiduciary duties as Trustee in order to use the trust estate.

5) The court finds that Connie Parker received a life estate in the Trust set up by the June 10, 1997 will, with the residual going to charities.

6) Connie Parker is not young, and the amount left over for charities depends on how long she lives and her health conditions.

7) The court finds that Connie Parker is not the principal beneficiary, but that she is one of the principal beneficiaries of the estate.

8) There is no direct evidence that Connie Parker participated in the will-making process. She sat in on some, but not all, meetings between Trigg Davis, Esq., the attorney who drafted Joel Kottke's will, and Joel Kottke. And she provided some information to Attorney Davis relative to the Anchorage condominium she co-owned with Mr. Kottke and relative to her social security benefits.

9) However, Trigg Davis, Esq., testified that Connie Parker did not participate substantively in the will preparation process. The thoughts as to what his will would provide were Joel Kottke's alone, developed independently by him in collaboration with his attorney, Trigg T. Davis. The intent reflected in the June 10, 1997 will is Joel Kottke's intent. He wanted to take care of Connie Parker and the charities specified. The choice of charities came from Mr. Kottke, not Connie Parker.

**16.** This Appendix consists of the findings of fact made by the superior court relevant to the issue of undue influence and in response to arguments raised by Iris Enders on that issue. The findings have been edited to conform to the appellate court rules and for technical form, but not for substantive content.

10) The court finds that Connie Parker did not participate substantively in the will preparation process, and what little involvement Connie Parker had in the process carries little, if any, weight as to the existence of any undue influence.

11) Joel Kottke obtained independent legal advice in connection with his June 10, 1997 will. That independent advice was thorough. Joel Kottke considered his options, including the option of leaving part of his property to charities, and part to Connie Parker.

12) It took Mr. Kottke a long time to make his will. When he was diagnosed with cancer he contacted an attorney about preparing a new will. Mr. Kottke did not sign any will until over six months after his first meeting with his attorney about the will. The Court finds that there was no haste involved in Mr. Kottke's will-making process.

13) In January 1997, Joel Kottke wrote to his brother, Ralph, and communicated his intent regarding his will. Joel Kottke shared his thoughts on Connie Parker needing to be taken care of, and his beliefs that his property should not pass to his step-children. There was not any secrecy involved in Joel Kottke's will-making process.

14) The court finds that there was a change in attitude by Joel Kottke towards others. The court also finds reasons for that change that have nothing to do with undue influence as follows:

(a) Relationships change over time, with relationships that were important at one time, sometimes fading. Relationships need to be nurtured.

(b) Joel Kottke had a relationship with his siblings, then time and distance came into play. Joel Kottke met with his siblings a total of about a half dozen times in the 1990s.

(c) Joel Kottke and Martha Kottke had a wonderful relationship and a wonderful life. When Martha Kottke was at the center of Joel Kottke's life, her family also took center stage. After Martha Kottke's death, the significance of the relationship between Joel Kottke and Martha Kottke's family diminished.

The relationships faded, and former bonds were weakened and stretched.

(d) Then Joel Kottke got together with Connie Parker. Their relationship started in 1992 to 1993, with a period of courtship, and the relationship developed from there. Joel Kottke and Connie Parker shared common interests and they developed a close, tight, intimate relationship with each other.

15) Based on the testimony presented at trial, the court finds that Connie Parker took care of Joel Kottke in the last months of his life, and that in doing so, she did a good job. This finding is based on the testimony of third-party observers, including Sharon Lind–Charron, Hannah Smith, Dr. Wrigley, and Dr. Webb.

16) The court finds that there was no indication of any physical abuse of Joel Kottke by Connie Parker.

17) Connie Parker was the main and primary person who gave care and comfort to Joel Kottke in the last months of his life. Joel Kottke and Connie Parker shared a life. They were not married, but they were significant others to each other. They were intimately involved in each other's lives.

18) As to the relationship between Martha Kottke's family and Connie Parker, it is clear that:

(a) The family was involved in Joel Kottke's life. However, they never took to Connie Parker, based largely on the differences between Martha Kottke and Connie Parker. The real crux is the alienation of affection in the relationship between Connie Parker and Martha Kottke's family. Joel Kottke was right in the middle of things.

(b) The Enders family did not accept Connie Parker, and there is some testimony that Martha Kottke did not like Connie Parker.

(c) The Enders family was outspoken in its animosity towards Connie Parker as early as 1993, with the most favorable testimony from the Enders family being that Connie Parker was "tolerable."

(d) Some of the worst words in the case were spoken by Greg Enders in his

testimony, where he described Connie Parker as a "decrepit old woman."

(e) Connie Parker likes to express ideas, she is chatty, and she can be loud.

19) The court also finds that Connie Parker, in response to the Enders' feelings towards her, had some distaste for the Enders family. She therefore put up some obstacles to them.

20) The court finds that there was a change in Joel Kottke's attitudes towards others, but that it was an understandable change since his significant other was in a feud with other family members.

21) The family feud culminated in the events of August 1997. Until August 1997, Martha Kottke's family's assumption was that Joel Kottke's original will was in existence and in full force. This was a reasonable assumption. When Iris Enders found out that Joel Kottke had changed his will, she laid claim to certain property. On August 3, 1997, she "set about to collect items that she thought were her mother's." Iris Enders felt some antagonism, but she failed to appreciate Joel Kottke's point of view. Joel Kottke was dying, but he refused to believe he was dying, as of August 1997.

22) Implicit in Iris Enders' attempts to collect property in August 1997 was the thought that Joel Kottke was going to die, and die soon.

23) The court finds that Robert Dixon's testimony was key. Mr. Dixon testified that Mr. Kottke did not understand and did not like Iris Enders' attempts to collect property. The August 1997 incident evidences a failing relationship.

24) The court further finds that even at the time of Joel Kottke's death, there was a dispute as to who was and was not family, rather than an acceptance that Joel Kottke had many families.

25) The court finds that there was a change in Joel Kottke's plan of disposing of his property. That is, his June 10, 1997 will provides for a different disposition than his 1983 will.

26) The court finds that the gifts made in Joel Kottke's June 10, 1997 will are not unnatural or unjust. Petitioners believe they are entitled to some of Joel Kottke's estate, and they have filed an Irrevocable Representation by Petitioners, in which they would purport to grant Connie Parker the condominium, a car transferred before Joel Kottke's death, and bank accounts. But under petitioner's Irrevocable Representation, Connie Parker would have no interest in Joel Kottke's Wasilla house.

27) The court appreciates Martha's family's position. However, Martha Kottke left everything to Joel Kottke in her 1983 will. In his June 1997 will he left essentially a life estate to Connie Parker, along with his interest in the condominium. The court finds that such a disposition is not unnatural or unjust.

28) Moreover, the court finds that Joel Kottke's gift of the residual to charity is not unjust or unnatural.

29) The court further finds that Joel Kottke's omission of siblings and step-children from his will is not unnatural or unjust. After careful deliberation, Joel Kottke's decision was that his siblings did not need his money, and he decided he wanted to use his money in a different way. Given the court's finding that Joel Kottke was in the middle of a strained relationship between Martha Kottke's family and his chosen companion, Connie Parker, it was not unnatural or unjust for him to make the choices he did with respect to his step-children.

30) The court finds that Joel Kottke was a quiet man who did not like confrontation, and would step away from it when he could.

31) However, the court also finds that although Mr. Kottke was a quiet man, he was an independent man, with his own ideas, his own thoughts, and his own lifestyle. He lived the life he wanted to live.

32) As evidence of this, Mr. Kottke chose charities that were not in the mainstream. Such choice reflects a person with strong beliefs.

33) Mr. Kottke was competent. All third party witnesses in this case testified that he was possessed of his faculties. The court finds it particularly telling that Mr. Kottke

had a sense of humor right up to the end of his life.

34) Mr. Kottke was not a vulnerable man. Even at the end of his life, with a lot of pressure being applied to him to do something different, he did not yield to that pressure. Martha Kottke's family questioned his competency, and he resisted it.

35) Joel Kottke was not isolated. During the period in dispute in this case, he had many friends, such as Robert Dixon, Roxanne Olson, and Linda Plettner. He had a strong support network.

36) In making the decisions he made for his property, Mr. Kottke engaged in a deliberate process, reviewed and looked at competing interests carefully, and made the decisions he did. He wanted to take care of Connie Parker, and he wanted to leave a legacy.