**In the Matter of the ESTATE OF Dale Everett IOUPE, aka Dale Edward Ioupe, aka Dale Everett Ioupe Montes, Deceased.**

**The MONTES FAMILY, Appellants,**

v.

**Angela Ioupe CARTER, Appellee.**

**No. 930354–CA.**

Court of Appeals of Utah.

July 15, 1994.

---

5. The current version provides for a single limit amount of $65,000. *See* Utah Code Ann. § 31A– 22–304(2) (Supp.1993).

Loni F. DeLand (argued), McRae & De-Land, Salt Lake City, for appellants.

Davis S. Kunz (argued), Ogden, for appellee.

Before BENCH, BILLINGS and ORME, JJ.

ORME, Associate Presiding Judge:

The Montes Family, appellants in this case, claim that the will of Dale Everett Ioupe is invalid for lack of testamentary capacity and because it is the product of undue influence. The trial court ordered the will admitted to probate, ruling that the decedent had the requisite capacity and was not unduly influenced in his testamentary disposition. We disagree with part of the trial court's analysis, but affirm its judgment.

## FACTS

Dale Everett Ioupe was born February 14, 1945, at Fort Duchesne in Uintah County, Utah. Dale was born to Elmer and Winnie Ioupe and was a full-blood member of the Ute Indian Tribe. At the age of twelve, Dale was adopted by Thomas and Opal Montes, with whom he had lived periodically prior to that time. Dale resided with the Montes family in Brigham City, Utah, following his adoption and until Thomas Montes died in the early 1960's. At that time, Dale returned to live with his natural relatives in Whiterocks, Utah.

In the mid–1960's, Dale's aunt, Grace Areep, arranged for Dale and his natural sister, appellee Angela Ioupe, to attend the Stewart Indian School in Carson City, Nevada. Angela testified that while at school together, she and Dale maintained a sibling relationship. Upon leaving school, Dale returned to his Aunt Grace's home.

In 1967, Dale was inducted into the United States Army. He was given a medical discharge approximately one year later and was awarded Veterans Administration disability benefits. At the time of his discharge, the Veterans Administration diagnosed Dale as suffering from paranoid schizophrenia.

For the next two decades, Dale was intermittently cared for in various hospitals and other institutions as a result of his chronic condition. While Dale was in a care facility in St. George, Utah, his sister Angela maintained contact with him, talking with him by telephone and occasionally sending him personal items. On February 25, 1982, while still in St. George, Dale was examined by Dr. John Bennee. At that time, Dr. Bennee concluded that while Dale's condition had improved remarkably as a result of new medication, he was not competent to handle his own affairs. A few months later, based upon Dr. Bennee's report, the Veterans Administration rated Dale as incompetent.

In late 1985 or early 1986, Angela instigated Dale's transfer, with his concurrence, from the St. George facility to a nursing home in West Valley City, Utah, so that he would be closer to her. Angela visited Dale three times while he was at the West Valley home. In the spring of 1986, Dale was released from the nursing home and went to live with his adoptive brother, David Montes, in Ballard, Duchesne County, Utah.

Because Dale was being released, the Veterans Administration, in conjunction with Dale's adoptive sister, Leonara Tasso, petitioned for the appointment of Tracy–Collins Bank & Trust as the conservator of Dale's veteran benefits. Tracy–Collins was appointed as Dale's conservator, based solely on the 1982 Veteran Administration incompetence rating and the underlying report of Dr. Bennee.

In August of 1987, according to Angela's testimony, Dale asked her to visit him during the annual Sun Dance at the Ute Indian Reservation. Angela stated that when she arrived on August 14, 1987, Dale requested that she take him to the tribal land office so that he could execute his will. Upon arrival at the land office, Dale and Angela were met by H. James Brafford, an officer of the Bureau of Indian Affairs responsible for acting as a scrivener in the probate office. At that time, Mr. Brafford interviewed Dale to assess his testamentary wishes. In conjunction with the interview, Mr. Brafford completed a federally required form which stated that in Mr. Brafford's experienced opinion (1) the executor was competent, (2) not under undue influence, and (3) gave a "cognizant mental impression." After the interview, Dale executed a will which named his sister Angela as

the sole beneficiary of his estate, to which Mr. Brafford attached the federal interview form.

During Dale's stay with his adoptive brother, David Montes, David received payments from the conservator of Dale's veterans benefits to defray Dale's expenses. In January of 1989, David also petitioned for and was appointed conservator of Dale's estate and guardian of Dale's person by the Ute Indian Tribal Court. As a result of David's appointment, the tribal court released a fund of $87,000 to David from Dale's accumulated share of tribal royalties and dividends. David apparently spent the entire amount between the time he was appointed Dale's conservator and the time of Dale's death. His purchases, ostensibly for Dale, included a home, pick-up truck, horse trailer, and a horse.

David was also in charge of administering Dale's daily medication for his schizophrenia. David testified that when Dale took his medication he was "real quiet," but that without it "he just didn't function right." David stated that while Dale lived with him he made sure that he got his medication on time. However, he also recalled that Dale would disappear at times, running off or going on drinking binges, at which times David was not able to administer Dale's medication.

Dale Ioupe died from acute alcohol intoxication on February 29, 1992. On April 27, 1992, West One Trust Company, successor to Tracy–Collins Bank and Trust Company, petitioned for formal probate of Dale's will and for the appointment of a personal representative for his estate. Members of the Montes family filed an objection to the validity of Dale's 1987 will, alleging that he was incompetent and under undue influence at the time it was executed. The trial court disagreed, determining that the decedent was competent and acted without undue influence. The trial court therefore admitted the will to

probate, appointing West One as personal representative.

Members of the Montes family now appeal, claiming that the trial court erred by failing to rule that the Veterans Administration incompetency rating, the two conservatorships, and the appointment of a guardian over Dale's person combined to establish a presumption of a lack of testamentary capacity. Alternatively, the Monteses claim that even if such a presumption was not triggered, the trial court erred in determining that the Monteses had not demonstrated such a lack of testamentary capacity, or the existence of undue influence in the execution of the will, by a preponderance of evidence.

## STANDARD OF REVIEW

 Whether a presumption of testamentary incapacity arises from the appointment of a conservator or guardian is a question of law. "We accord a trial court's legal conclusions no deference but review them for correctness." *Kennecott Corp. v. State Tax Comm'n,* 862 P.2d 1348, 1350 (Utah 1993). On the other hand, we defer to the trial court's specific findings of fact underlying its determination that the deceased was competent to make a will and that the will was not made under undue influence, reviewing the factual findings only for clear error. *In re Estate of Bartell,* 776 P.2d 885, 886 (Utah 1989). We review the trial court's ultimate legal conclusions of testamentary capacity and lack of undue influence for correctness, although "some deference" will be accorded to the trial court in the process of reviewing certain applications of law to fact. *See State v. Pena,* 869 P.2d 932, 935–39 (Utah 1994).[1]

## TESTAMENTARY CAPACITY

### A. Presumption of Competence

The Monteses claim that Dale did not have the requisite capacity to make a will because

---

1. *Pena* does not offer concrete guidance about how much deference, if any, should properly be given to a trial court's determinations regarding undue influence and testamentary capacity. To borrow the *Pena* metaphors, we are not certain where along the spectrum of discretion, or within the factual pastures fenced by appellate courts, such issues fall. *See* 869 P.2d at 937–38. Nor need we wrestle with the question in this case, for, as will be seen, the trial court's determinations are readily sustainable with reference only to its explicit findings and without any particular need for deference. Thus, any examination of the proper role of deference in this context would be of theoretical interest at most.

of his mental illness and that he should have been presumed incapable of making a will as a result of the legal determinations which resulted from his mental limitations, including the establishment of two conservatorships for his benefit.

 Under Utah law, a testator must be "of sound mind" to make a will. Utah Code Ann. § 75–2–501 (1993). The general rule is that "[a] testator is presumed competent to make a will, and the burden of proof of testamentary incapacity is on the contestant of a will." *In re Estate of Kesler,* 702 P.2d 86, 88 (Utah 1985). *See* Utah Code Ann. § 75–3–407(1) (1993). However, the Montes family argues that decedent's rating of incompetence by the Veterans Administration, the appointment of conservators to manage both his veteran and tribal benefits, and the appointment of a guardian over him defeat the usual presumption of testamentary capacity and establish a presumption of a lack of capacity.

We disagree that such a showing reverses the presumption. Decedent's initial conservatorship was based solely on the Veterans Administration incompetency rating and its condition that a conservator be appointed before benefits would be disbursed. In fact, a rating of incompetence is sufficient to establish a conservatorship to manage a veteran's benefits under Utah law. *See* Utah Code Ann. § 75–5–314 (1993). However, a Veterans Administration rating of incompetence means only that "because of injury or disease [the veteran] lacks the mental capacity to contract or to manage his or her own affairs, including disbursement of funds without limitation." 38 C.F.R. § 3.353(a) (1993).

 Accordingly, an incompetency rating is not an adjudication of insanity, nor even a determination of a lack of testamentary capacity. *In re Estate of Roosa,* 753 P.2d 1028, 1037 (Wyo.1988). In addition, the subsequent appointment of a conservator based on that rating does not constitute any such determination either. *In re Estate of Kesler,*

702 P.2d 86, 96 (Utah 1985); *Roosa,* 753 P.2d at 1037. Rather, such a conservatorship "is of limited effect and relates primarily to the receipt of veterans' benefits." *Roosa,* 753 P.2d at 1037.

Nor did the tribal court's appointment of a conservator and guardian necessarily establish that decedent was incapable of making a will. *See Kesler,* 702 P.2d at 96. Decedent's adoptive brother, David Montes, petitioned for the appointment, which, when granted, gave him power over decedent's tribal benefits and also over his person while on the reservation. Neither the record nor the tribal court's order reveal the evidentiary basis for the appointment of David Montes as decedent's conservator and guardian. Nor does the tribal court's order purport to be an adjudication of insanity or testamentary incapacity, but states only "that the best interest and welfare of the protected person will be served by appointment of David Montes as conservator of the estate of the protected person, and as guardian of his person." [2]

 Decedent's inability to manage his ordinary business affairs does not justify a presumption of testamentary incapacity. Contractual capacity and testamentary capacity involve two separate standards. *See In re Chongas' Estate,* 115 Utah 95, 202 P.2d 711, 713 (1949) ("person may lack sufficient capacity to transact his ordinary business affairs and yet have capacity to make a will"); *Bergen v. Travelers Ins. Co.,* 776 P.2d 659, 664 (Utah App.1989) (standard for testamentary capacity is lower than that required to transact business). Where all that has been adjudicated is the party's inability to contract and/or manage his or her on-going financial affairs, a determination of testamentary capacity is not foreclosed. Accordingly, we hold that the Veterans Administration incompetency rating, and resulting conservatorships and guardianship, do not create a presumption of decedent's incapacity to make a will.

 Nonetheless, it would be erroneous to conclude that such indicia of diminished

---

**2.** In apparent recognition of the already existing Veterans Administration conservatorship, the tribal court's order also limited its application to those matters not within the scope of the existing conservatorship.

mental capacity have no effect at all on the general presumption of testamentary capacity. While the Monteses go too far in arguing that such factors give rise to a presumption of testamentary incapacity, we must conclude that they at least neutralize the presumption of testamentary capacity which generally obtains. In effect, such a showing levels the playing field and leaves the proponent of the will without the benefit of the usual presumption but also without the hurdle of a presumption in the contestant's favor. This would leave the proponent of the will with the burden to show, by a simple preponderance of the evidence, that the decedent had the requisite mental capacity to make a valid will.

Accordingly, the trial court erred in ruling that the presumption of testamentary capacity survived the incompetency rating, conservatorships, and guardianship intact. However, it did not err in holding that no presumption of incapacity came into existence by reason of such factors.

### B. Adequacy of Factual Basis

■ Nonetheless, remand for reconsideration with the correct principles in mind is not necessary. The trial court's legal error was harmless in this case because it did not materially affect the court's decision. *See* Utah R.Civ. P. 61; *State v. Verde*, 770 P.2d 116, 120 (Utah 1989). Even though the court ruled that the Veterans Administration incompetency rating and subsequent conservatorships did not disturb the presumption of capacity, the trial court entered specific, detailed factual findings supporting its determination of testamentary capacity, which appear not to have depended at all on any legal presumption.

Under Utah law, there is a three-part test to determine testamentary capacity. *In re Estate of Kesler*, 702 P.2d 86, 88 (Utah 1985). In order to make a valid will, "one must be able to (1) identify the natural objects of one's bounty and recognize one's relationship to them, (2) recall the nature and extent of one's property, and (3) dispose of one's property understandingly, according to a plan formed in one's mind." *Id.*

In this case, the trial court made specific factual findings—uninfluenced by its view on the applicability of the presumption of testamentary capacity—establishing each of the three above-stated elements. First, the trial court found that, based on the evidence, "[t]he decedent understood who his family, both natural and adoptive were; he understood the relationships to both sets of siblings." Second, the court found that "[t]he decedent was aware that he received Veterans' Administration funds and tribal funds; he understood that he owned a horse and a house." Third, according to the court, decedent had a "valid foundation to connect [his sister Angela] as his sole heir in his blood family," which made his testamentary disposition "natural and more probably rational than not under the circumstances." Finally, the trial court found "that proper medication and alcohol abstention would allow the Decedent to function on a level consistent with testamentary capacity," and that decedent was "not intoxicated nor under the influence of intoxicants" at the time he made the will.

As a result, based upon its factual findings, and without reference to the presumption it believed applied, the trial court determined that decedent possessed the requisite capacity to dispose of his property by will. While decedent may have required conservators to manage the expenditure of his substantial veteran and tribal benefits, "the standard for measuring the capacity to execute a will is somewhat less stringent than the capacity to contract or otherwise transact business generally." *Bergen v. Travelers Ins. Co.*, 776 P.2d 659, 664 (Utah App.1989). Further, " 'the law does not require that a person be particularly alert, nor need he have any special acumen in order to execute a will.' " *Id.* (quoting *In re Estate of Richards*, 5 Utah 2d 106, 297 P.2d 542, 548 (1956)). Finally, in determining whether a testator is of sound mind, " 'the test is whether the testator had testamentary capacity at the time the alleged will was made, and the inquiry should be limited to a period of time not too remote from that event.' " *In re Estate of Kesler*, 702 P.2d 86, 93 (Utah 1985) (quoting *In re Hansen's Will*, 50 Utah 207, 167 P. 256, 261 (1917)).

While decedent may have been generally incapable of managing his business affairs, the trial court properly focused its attention on decedent's *testamentary* capacity during the time period surrounding the execution of his will. Accordingly, given the trial court's findings corresponding to the three *Kesler* elements of testamentary capacity, which the Monteses have not shown to be clearly erroneous, we affirm the trial court's determination that Dale had the testamentary capacity necessary to make a valid will.

## UNDUE INFLUENCE

The Montes family also claims that the trial court erred in concluding that decedent's sister, Angela, did not exert any undue influence over him in the disposition of his property. In order to declare a will invalid for undue influence under Utah law,

> there must be an exhibition of more than influence or suggestion, there must be substantial proof of an overpowering of the testator's volition at the time the will was made, to the extent he is impelled to do that which he would not have done had he been free from such controlling influence, so that the will represents the desire of the person exercising the influence rather than that of the testator.

*In re Lavelle's Estate,* 122 Utah 253, 248 P.2d 372, 375–76 (1952). *Accord Baker v. Pattee,* 684 P.2d 632, 637 (Utah 1984).

Undue influence is presumed where a confidential relationship exists between the testator and the beneficiary of the will. *In re Estate of Jones,* 759 P.2d 345, 347 (Utah App.1988), *rev'd on other grounds,* 858 P.2d 983 (Utah 1993). Such "[a] confidential relationship arises when one party, after having gained the trust and confidence of another, exercises extraordinary influence over the other party." *Id.* However, while a few relationships, such as that of attorney and client, are presumed to be confidential, "[i]n all other relationships the existence of a confidential relationship is a question of fact." *Id.* Accordingly, " '[w]hile kinship may be a factor in determining the existence of a legally significant confidential relationship, there must be a showing, in addition to the kinship, [of] a reposal of confidence by one party and the resulting superiority and influence on the other party. . . . Mere confidence in one person by another is not sufficient alone to constitute such a relationship.' " *Id.* at 347–48 (quoting *Bradbury v. Rasmussen,* 16 Utah 2d 378, 401 P.2d 710, 713 (1965)). *Accord Baker,* 684 P.2d at 637.

The Monteses have made no such showing regarding the decedent's relationship with his natural sister. In fact, they do little more than assert that because Angela was the decedent's sister, a confidential relationship existed. Such a conclusion is contrary to *Jones.*

Moreover, a determination of undue influence is not borne out by the evidence in this case. The Montes family has not established that Angela overpowered Dale's volition, thereby imposing her own desires in the making of his will. In fact, the trial court specifically found to the contrary. According to the trial court's findings of fact, the decedent asked his sister to visit him during the annual Sun Dance and then asked her to take him to execute his will. The decedent did not live with his sister and, in fact, had comparatively infrequent contact with her. The court also found that the decedent had "a mind of his own" and that he was "rather strong willed" about the things he wanted to do. Finally, the trial court also noted that Mr. Brafford, the official scrivener, interviewed the decedent regarding his testamentary wishes and concluded that he was not under any undue influence at the time he made the will.

Accordingly, given the Monteses' failure to demonstrate clear error in the trial court's findings of fact supporting its determination that the decedent was not unduly influenced in his testamentary disposition, we affirm the trial court's decision in this respect as well.

## CONCLUSION

While the trial court erred in concluding that the Veterans Administration incompetence rating and the subsequent appointment of conservators and a guardian had no effect on the usual presumption of testamentary capacity, such error was harmless because the trial court separately determined,

based upon specific factual findings, that the decedent had the requisite capacity to make a will. Nor did the trial court err in concluding that the decedent was not unduly influenced in his testamentary disposition. Accordingly, we affirm the trial court's decision admitting decedent's will to probate.

BILLINGS, J., concurs.

BENCH, Judge (concurring in the result only):

I would affirm the trial court's ruling using the proper standard of review, as explained in *State v. Pena*, 869 P.2d 932, 936–39 (Utah 1994). The trial court's determinations that the decedent was both competent and not unduly influenced involve application of law to fact, and therefore, are entitled to "some deference." *See id.* The main opinion attempts to restrict *Pena* by enlarging appellate review on application questions when there are specific factual findings. I do not believe the existence of specific factual findings should modify our standard of review on application questions.