**2016 UT App 211**

## THE UTAH COURT OF APPEALS

ANDREW L. ELLSWORTH, MARK L. ELLSWORTH, MICHELLE THOMAS,
KEN L. ELLSWORTH, TAMI JASPER, TIM ELLSWORTH, AND THE
ELLSWORTH FAMILY TRUST,
*Appellants,*
*v.*
TERRY HUFFSTATLER, JIM HUFFSTATLER, KARL V. BAKER,
KEITH A. BAKER, THE ESTATE OF BARBARA MAY ELLSWORTH, THE
ELLSWORTH FAMILY TRUST, AND THE BARBARA MAY
ELLSWORTH TRUST,
*Appellees.*

Opinion
No. 20150478-CA
Filed October 20, 2016

Fourth District Court, Provo Department
The Honorable David N. Mortensen
No. 130400498

Brett D. Cragun, Attorney for Appellants

Douglas B. Thayer and Aaron R. Harris, Attorneys
for Appellees

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGES KATE A. TOOMEY and JILL M. POHLMAN concurred.

VOROS, Judge:

¶1 This is a will dispute between the biological children of
one spouse—Elmer Ellsworth—and the biological children of the
other—Barbara May Ellsworth. We refer to the former as the
Ellsworths and the latter as the Huffstatlers. The first question
on appeal concerns certain gold, silver, and platinum coins (the
Coins) Elmer owned at his death; the district court ruled on
summary judgment that these Coins passed to Barbara under
Elmer's will. The second question on appeal concerns whether

one of Barbara's children, Terry Huffstatler, exerted undue influence over Barbara when Barbara altered her estate plan shortly before she died. The district court ruled, after a bench trial, that Terry did not. The Ellsworths challenge both rulings. We affirm.[1]

BACKGROUND

¶2 Spouses Elmer Ellsworth and Barbara May Ellsworth executed a trust agreement in 1991 (the 1991 Trust). The 1991 Trust named Elmer and Barbara as primary beneficiaries, and it named Elmer's seven biological children and Barbara's three biological children as contingent beneficiaries. Elmer also executed a will.

¶3 Elmer, the owner of the Coins, died in 2003. His will devised to Barbara all of his personal property "as hereinafter defined":

> **FOURTH: Personal Property**
> If my spouse survives me, I give to her all items of
> Personal Property (as hereinafter defined).

The will also defined and disposed of Elmer's "residuary estate":

> **FIFTH: Disposition of Residuary Estate**
> "My residuary estate" means all my interest in real
> and personal property, whether community or
> separate and wherever situated, which I may own
> at my death (excluding property over which I may
> have a power of appointment) and which I have

---

1. In this decision, because many family members "share a last name, we refer to them by their first names for clarity, with no disrespect intended by the apparent informality." *Earhart v. Earhart*, 2015 UT App 308, ¶ 2 n.1, 365 P.3d 719.

> not disposed of by the preceding provisions of this
> Will.

Elmer's will was never probated. The Coins remained in a safe in Barbara's home until 2012, when Terry Huffstatler and Mark Ellsworth placed them in a bank safety deposit box.

¶4 In the years before her death, Barbara's physical and mental health waned. As a result, she increasingly relied on her daughter, Terry, for her care. In November 2012, Barbara suffered a fall that required her to undergo surgery and begin taking prescription medication. Medical records show that after the fall Barbara was often "forgetful," was "disoriented as to time and place," was "unable to manage her money," and "suffered from dementia and memory loss"; but she was "alert and pleasant" and "otherwise doing well" during the months following her fall. Due to Barbara's declining health, she and Terry visited Barbara's estate planning attorney, who had drafted Elmer's will. The attorney suggested that Barbara sign an updated general power of attorney authorizing Terry to act for Barbara in her personal affairs.

¶5 Shortly after Barbara signed the power of attorney, Terry and Mark Ellsworth set up a meeting to review their probable future roles as co-trustees of the 1991 Trust. During the meeting, Terry told Mark that Barbara wanted to sell her home. Terry also told Mark about the power of attorney. Mark explained that he wanted to talk to his siblings about both matters.

¶6 After speaking with his siblings, Mark sent Terry an email on behalf of the Ellsworths. The email suggested that Barbara resign as the trustee of the 1991 Trust:

> We as a family all believe caring for [Barbara's]
> needs is the top priority. In reviewing [Barbara's]
> health condition, we feel that given her ongoing
> declining medical condition and memory as well as
> [other health conditions], that she is not in a

condition to manage any fiscal matters. We believe this is supported in action by you, by the fact that you had Barbara sign over to you a power of attorney and are handling her fiscal affairs.

In considering this we believe that the best way to proceed is to have Barbara officially resign from the trust (she has already defaulted by signing power of attorney over to you). This will place the fiscal aspects of the estate/trust into the manner it was planned for originally when the survivor of our parents was no longer able, and put responsibility legally into a joint partnership between you and me.

After completing [Barbara's] resignation you and I can get together and work out a joint relationship in managing the remaining assets of the estate/trust and [Barbara's] ongoing care needs. If you do not have any objections to this direction, I would suggest we both meet with Barbara to discuss this and have her sign a resignation.

After receiving the email, Terry told Barbara about the email and explained that the Ellsworths wanted her to resign as trustee of the 1991 Trust. Terry did not show Barbara the email itself, however. Terry testified that Barbara "was very hurt that Mark would ask her to resign because . . . she liked to be able to make choices for herself." Barbara suggested they talk to her lawyer, and Terry set up a meeting. Terry and the lawyer both testified that Barbara asked for the meeting because she took offense at Mark's assertion that she should resign as trustee. Barbara was also offended by the Ellsworths' alleged efforts to block the sale of her home.

¶7    Before meeting with the lawyer, Barbara and Terry visited Barbara's doctor. Terry testified that the purpose of the visit was

to follow up on Barbara's recovery from her fall and to see if Barbara was "able to make self-care directives, and participate in an overall understanding of surroundings, and ability to participate in the decision making process." The doctor confirmed that Barbara suffered from confusion but concluded that "at this point she should be able to still manage her legal affairs but would have family available if needed should there be any changes." Her doctor also conducted a "Mini Mental Status Exam." Barbara scored mild or moderate cognitive impairment. The doctor noted, however, that Barbara was "overall still able to understand conversations" and be "an active participant in her care."

¶8      At the lawyer's office, Barbara stated that "she wanted different distribution provisions upon her death . . . because she felt she was being treated unfairly by the Ellsworth children"; she also "wanted to know what she could do to make sure more of the assets went to her children rather than the Ellsworth children." The lawyer read Mark's email. Following the consultation, the lawyer drafted—and Barbara signed—a new set of estate planning documents. These included a will, a new power of attorney, and a new trust—the Barbara May Ellsworth Trust (the 2013 Trust). These documents transferred the Coins and half the property from the 1991 Trust into the 2013 Trust. The 2013 Trust documents named the Huffstatlers as the only beneficiaries. Under these documents, the Ellsworths were no longer in line to receive half of the property—including the Coins—they had expected to receive as secondary beneficiaries under the 1991 Trust.

¶9      A few days after Barbara executed the 2013 Trust, Mark and his sister, Tami Jasper, visited Barbara in her home to gauge whether she was open to the idea of resigning as trustee of the 1991 Trust. They took with them a resignation document. The parties dispute whether the visit was cordial or confrontational. Tami described Barbara as undecided until Tami appealed to Barbara's religious sensibilities. Barbara signed the resignation

document. Barbara later revoked the resignation. But two months later, Barbara again resigned as the trustee of the 1991 Trust. Six months after that, Barbara died; at that time she suffered from advanced dementia.

¶10    The Ellsworths sued the Huffstatlers, seeking to recover the assets that Barbara had moved from the 1991 Trust to the 2013 Trust. The district court ruled on partial summary judgment that the Coins passed to Barbara under Elmer's will. As the owner of the Coins, the court ruled, Barbara was free to place them into the 2013 Trust for the sole benefit of her own children. The court conducted a bench trial on a number of remaining issues, including the issue of undue influence. After the bench trial, the court ruled that Barbara did not create her 2013 estate plan under Terry's undue influence. The Ellsworths appeal.

ISSUES

¶11    The Ellsworths assert two issues on appeal. First, they contend that the district court erred when it read Elmer's will to say "that Barbara is to receive Elmer's personal property which was not transferred to someone else or to the family trust."

¶12    Second, the Ellsworths contend that "the trial court erred when it determined that the creation of the 2013 Trust was fair and therefore the presumption of undue influence did not apply."

ANALYSIS

I. The Coins

¶13    The Ellsworths challenge the district court's summary judgment ruling that the Coins passed to Barbara under Elmer's will. They argue that the court misapplied the Uniform Probate Code because it misread Elmer's will.

¶14 "An appellate court reviews a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness, and views the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citations and internal quotation marks omitted).

¶15 Elmer's will was never probated. Under the Utah Uniform Probate Code, if a decedent's will is not probated within three years, the decedent is presumed to have died intestate, and the decedent's property passes to their heirs under the laws of intestacy:

> If no will is probated within three years from death, the presumption of intestacy is final and the court shall upon filing a proper petition enter an order to that effect.

Utah Code Ann. § 75-3-107(3) (LexisNexis Supp. 2016). However, this rule is subject to an exception. An unprobated but otherwise valid will may prove a devise if the property recipient designated in the will "possessed the devised property in accordance with . . . the will":

> [A] duly executed and unrevoked will which has not been probated may be admitted as evidence of a devise if both:
>
> (1) no court proceeding concerning the succession or administration of the estate was commenced during the time period for testacy proceedings; and
>
> (2) either the devisee or the devisee's successors and assigns possessed the property devised in accordance with the provisions of the will, or the property devised was not possessed or claimed by anyone by virtue of the decedent's title during the time period for testacy proceedings.

*Id.* § 75-3-102. Relying on this provision, the district court rejected the presumption that Elmer died intestate and ruled that, after his death, Barbara possessed the Coins in accordance with the provisions of his will.

¶16    The Ellsworths contend that, because Elmer's will was never probated, the law presumes that he died intestate, and thus that the Coins passed to them as his heirs. The Huffstatlers contend—and the district court ruled—that the exception to the intestate presumption applies because, after Elmer's death, Barbara possessed the Coins in accordance with Elmer's will. Barbara indisputably possessed the Coins after Elmer's death; we must determine whether she did so in accordance with Elmer's will.

¶17    "The intention of a testator as expressed in his will controls the legal effect of his disposition." *Id.* § 75–2–603. "A will is construed to pass all property the testator owns at death and all property acquired by the estate after the testator's death." *Id.* § 75-2-602. Accordingly, "we construe a will according to the intention of the testator" and prefer the interpretation that "prevents intestacy." *In re Estate of Hunt*, 842 P.2d 872, 874 (Utah 1992). "Moreover, if the will is ambiguous, any rule of construction normally used in other writings must yield to the intention of the testator as revealed in the instrument." *In re Estate of Hamilton*, 869 P.2d 971, 975 (Utah Ct. App. 1994).

¶18    Paragraph four of Elmer's will left to Barbara all of Elmer's "Personal Property (as hereinafter defined)." The parties agree that the Coins were personal property. However, the Ellsworths argue that the Coins were not "Personal Property (as hereinafter defined)" because the will never defined "Personal Property." In their view, absent a definition of "Personal Property," the term "Personal Property (as hereinafter defined)" describes an empty category. Thus, they reason, Elmer left Barbara no personal property. And they, as his heirs, inherit the Coins.

¶19    On summary judgment, the district court ruled that "[e]ven though Elmer['s] [will] does not define the words "Personal Property," "[a] plain reading of the Will explains that Barbara is to receive Elmer's personal property which was not transferred to someone else or to the family trust." And because Elmer did not transfer the Coins to either the trust or to any individual, the district court ruled that the Coins passed to Barbara in accordance with the "plain reading" of Elmer's will. We affirm the district court because we conclude that the Ellsworths' reading of the will lacks plausibility.

¶20    The parties offer competing explanations for why Elmer's will lacks an explicit definition of "personal property." The Huffstatlers argue—and the district court concluded—that the will indicates Elmer's intent to devise to Barbara all of his personal property, but due to a drafting oversight, the will neglected to fulfill its promise to define the term "personal property." The Ellsworths argue that the will indicates an intent to devise Barbara nothing. In this scenario, Elmer intended to give Barbara nothing by devising to her "all items of Personal Property (as hereinafter defined)," but then, by not defining "all items of Personal Property," ensured that nothing would pass to her under the provision.

¶21    Bearing in mind that "we construe a will according to the intention of the testator" and prefer the interpretation that "prevents intestacy," *Hunt*, 842 P.2d at 874, we, like the district court, accept the Huffstatlers' reading. "Personal property" is a well-understood term of art that normally requires no definition. Common experience suggests that the drafter's omission of a definition for "personal property" more likely resulted from the drafter's oversight than Elmer's intent to disinherit his wife. Indeed, the Ellsworths offer no explanation for why a husband intending to disinherit a wife would employ so subtle, indirect, and circuitous a method as omitting the definition of a common legal term. Moreover, their reading of paragraph four would reduce it to a nullity. This reading thus lacks plausibility.

¶22 In sum, only the Huffstatlers' reading achieves the goal of construing the provisions of Elmer's will with an eye to "giving effect to all and ignoring none." *See Hull v. Wilcock*, 2012 UT App 223, ¶ 28, 285 P.3d 815 (citation and internal quotations marks omitted). We therefore affirm the district court on this issue.[2]

## II. Undue Influence

¶23 Next, the Ellsworths contend that the district court "erred when it determined that the creation of the 2013 Trust was fair and therefore the presumption of undue influence did not apply."

¶24 The Ellsworths contend that "the trial court erred when it determined [the Huffstatlers] rebutted the presumption that Barbara's creation of the 2013 Trust was unfair." They stress that Barbara did not personally read the email Mark sent to Terry but acted on Terry's summary of its contents. And they seize on the

---

2. *See* Even if we were disinclined to affirm the district court's ruling based on the court's rationale, we would affirm its ruling on the alternative ground that the will does define "personal property." Paragraph four leaves to Barbara "all items of Personal Property (as hereinafter defined)." Paragraph five defines both "residuary estate" and Elmer's "personal property":

> "My residuary estate" means all my interest in real and personal property, whether community or separate and wherever situated, which I may own at my death (excluding property over which I may have a power of appointment) and which I have not disposed of by the preceding provisions of this Will."

This paragraph defines Elmer's "personal property" to include community or separate property wherever situated that Elmer owned at his death, but not to include property over which he had only a power of appointment. This appears to be the definition promised in paragraph four.

district court's finding that "Terry overreacted to Mark's initial suggestion that Barbara step down as trustee." Consequently, they argue that "to rebut the presumption of unfairness, there must be some showing that Barbara was not acting on Terry's overreaction to the email."[3]

¶25    Undue influence is proven by evidence that the "testator's volition" was "overpowered":

> [T]here must be an exhibition of more than influence or suggestion, there must be substantial proof of an overpowering of the testator's volition at the time the will was made, to the extent he is impelled to do that which he would not have done had he been free from such controlling influence, so that the will represents the desire of the person exercising the influence rather than that of the testator.

*In re Estate of Ioupe*, 878 P.2d 1168, 1174 (Utah Ct. App. 1994) (quoting *In re Lavelle's Estate*, 248 P.2d 372, 375–76 (Utah 1952)). "Undue influence is presumed where a confidential relationship exists between the testator and the beneficiary of the will." *Id.* A "confidential relationship arises when one party, after having gained the trust and confidence of another, exercises extraordinary influence over the other party." *Id.* (citation and internal quotation marks omitted). "If a confidential relationship is found, any transaction that benefits the party in whom trust is reposed is presumed to have been unfair and to have resulted from undue influence and fraud." *Webster v. Lehmer*, 742 P.2d 1203, 1206 (Utah 1987) (citation and internal quotation marks omitted).

---

3. The Ellsworths do not challenge the district court's ruling that Barbara had testamentary capacity to create the 2013 Trust and other documents.

¶26    Whether a confidential relationship exists is generally a question of fact. *Id.* If a confidential relationship is found, "the defendant ha[s] the burden of proving absence of undue influence." *Robertson v. Campbell*, 674 P.2d 1226, 1233 (Utah 1983). "We review the trial court's ultimate legal conclusion[] of . . . lack of undue influence for correctness," but "we defer to the trial court's specific findings of fact underlying its determination that the deceased was competent to make a will and that the will was not made under undue influence, reviewing the factual findings only for clear error." *Ioupe*, 878 P.2d at 1171 (citing *In re Estate of Bartell*, 776 P.2d 885, 886 (Utah 1989)). A finding is clearly erroneous if it is "against the clear weight of evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." *State v. Walker*, 743 P.2d 191, 193 (Utah 1987).

¶27    Here, the district court ruled that although Terry and Barbara had a confidential relationship, "the trial testimony and evidence has dispelled the presumption of undue influence." Specifically, the district court found that the new estate plan "reflected Barbara's wishes." Barbara's estate planning documents were drafted with the help of Barbara's long-time attorney. Barbara—not Terry—proposed the meeting with the attorney to amend her estate plan. In the words of the district court, Barbara had "her own personal motivation[]" to create the 2013 estate plan—she was upset by the Ellsworths' perceived attempts to block the sale of her home and their request that she step down as trustee of the 1991 Trust. And Barbara conveyed this motivation to her attorney directly, not through Terry. The attorney read the email himself and testified that Barbara came to him "to know what she could do to make sure more of the assets went to her children rather than the Ellsworth children."

¶28    The Ellsworths' argument rests heavily on the district court's finding that "Terry overreacted to Mark's initial suggestion that Barbara step down as trustee." But, as the Huffstatlers point out, no evidence suggests that Terry

misrepresented the contents of the email. Terry explained to Barbara that the email indicated that the Ellsworths wanted Barbara to step down as trustee of the 1991 Trust. And as explained above, the lawyer himself also read the email and explained that Barbara's motivation was to "know what she could do to make sure more of [her] assets went to her children rather than the Ellsworth children."

¶29   Our review of the record does not indicate that the district court's findings are "against the clear weight of evidence," or "that a mistake has been made." *Walker*, 743 P.2d at 193. On the contrary, we agree with the district court's finding and agree that the Huffstatlers rebutted the presumption of undue influence. *See Robertson*, 674 P.2d at 1233. The record lacks "substantial proof of an overpowering of [Barbara's] volition at the time the will was made, to the extent [she] was impelled to do that which [she] would not have done had [she] been free from such controlling influence, so that the will represents the desire of [Terry] rather than that of [Barbara]." *See Ioupe*, 878 P.2d at 1174 (citing *Lavelle's Estate*, 248 P.2d at 375–76). Accordingly, because the district court's ruling is not "against the clear weight of the evidence," we reject the Ellsworths' undue-influence challenge.

CONCLUSION

¶30   For the foregoing reasons, the judgment of the district court is affirmed.

———————